606 A.2d 936

**NORTHEASTERN VENDING COMPANY, Appellant,**

v.

**P.D.O., INC., t/a Flood's.**

Superior Court of Pennsylvania.

Submitted Jan. 21, 1992.

Filed April 20, 1992.

Carl J. Poveromo, Asst. Public Defender, Scranton, for appellant.

George W. Westervelt, Jr. and John P. Lawler, Stroudsburg, for appellee.

Before DEL SOLE, HUDOCK and HOFFMAN, JJ.

HOFFMAN, Judge:

This is an appeal from the judgment entered on November 4, 1991, awarding appellant, Northeastern Vending Company, $4,600.00 in compensatory damages and $1,500.00 in incidental damages against appellee, P.D.O., Inc., t/a Flood's. Appellant presents the following issues on appeal:

1. Whether the the trial court erred in requiring Northeastern to mitigate damages by re-leasing the equipment and in failing to award damages for Northeastern's loss of profits?

2. Whether the trial judge's verdict should be increased to compensate Northeastern for its lost profits?

Appellant's Brief at 3. For the following reasons, we affirm.

The trial court made the following findings of fact:

1. Plaintiff is Northeastern Vending Company, (hereinafter Northeastern), a subsidiary of Norbeth Corporation, having a principal place of business at 650 N. Main Street, Taylor, Pa. 18517.

2. Defendant is P.D.O., Inc., t/a Flood's (hereinafter P.D.O.), having a principal place of business at 732 Main Street, Stroudsburg, Pa. 18360.

3. On July 12, 1984, Northeastern entered a Judgment by Confession in the amount of $50,000.00 against P.D.O. The judgment, docketed at No. 1429–1984–Civil, is based on an Exclusive Amusement Machine Location Contract entered into between P.D.O. and Northeastern on August 22, 1983.

4. On July 12, 1984, Northeastern entered a second judgment by confession against P.D.O. in the amount of $10,000.00. This judgment was based on an Exclusive Cigarette Vending Machine Location Contract entered into between Northeastern and P.D.O. on August 22, 1983.

5. On August 14, 1984, P.D.O. filed a Petition to Strike or Open the Judgments docketed at Nos. 1429–1984 and 1430–1984 Civil.

10. Both parties agree that P.D.O. borrowed $5,000.00 from Northeastern on August 22, 1983 and that the money was to be repaid within one year at an interest rate of 18%. This transaction is evidenced by a note signed by Paul D. Oriel acting as an officer of P.D.O.

. . . . .

12. In addition to signing the notes, Paul D. Oriel signed two additional contracts. The first was an "Exclusive Amusement Machine Location Contract" and the second an "Exclusive Cigarette Vending Machine Location Contract."

13. Each of the contracts contained liquidated damage clauses that were not filled in at the time the parties signed the contracts. The amounts were subsequently filled in by Northeastern.

14. The five thousand dollar note was to be repaid within one year. Originally, P.D.O. was to repay Northeastern $100.00 a week plus its 50% of the profits generated from the juke box and the poker machine. That agreement was orally modified and the parties agreed that P.D.O. was to repay Northeastern $125.00 a week by check and it would retain its 50% of the profits generated by the juke box and the poker machine.

. . . . .

16. With the exception of a few weeks, regular payments on the loan of $125.00 a week were made by P.D.O. to Northeastern beginning in September 1983 and ending in February 1984.

17. The profits from the juke box and the poker machine were divided 50/50 between Northeastern and P.D.O. on a weekly basis with the exception of a few weeks where Paul D. Oriel was not present on the day Northeastern's serviceman would arrive to determine the weekly profits. The machines would not be emptied by Northeastern's serviceman unless Paul D. Oriel was present.

18. The profits from the cigarette machine were to be divided on a quarterly basis. On October 10, 1983, P.D.O. received $182.00 for its share of the cigarette profits for

the third quarter of 1983. P.D.O.'s share of the profits from the cigarette machine for the fourth quarter of 1983 were withheld by Northeastern and applied to the outstanding balance of the $5,000.00 loan.

19. On several occasions in November and December of 1983, P.D.O. requested an accounting of the loan balance from Northeastern.

20. On or about late February or early March of 1984, P.D.O. replaced Northeastern's vending machines with machines from Detrick Vending.

21. Subsequent to P.D.O.'s replacing Northeastern's vending machines, Northeastern stored the machines in its warehouse where it maintains several hundred other machines.

Opinion, Vican, J., October 31, 1990, at 1–4.

The trial court held that P.D.O. was in breach of the exclusive dealings contract when it replaced Northeastern's vending machines with those of another company. The trial court also determined that the liquidated damages provisions were null and void, and awarded Northeastern damages in the amount of $4,500.00 ($2,500.00 balance of principle on the note as of February 1984, plus 6% interest per annum) plus $1,500.00 incidental damages. On appeal, appellant raises two challenges to the trial court's award of damages.

### A.

Appellant first claims that the trial court erred in requiring it to mitigate damages.

Specifically, appellant recognizes that there is a general duty to mitigate in cases involving commercial transactions, but contends that such a duty is inapplicable where the non-breaching party is a "lost volume seller." However, this Commonwealth does not recognize the theory of "lost volume seller." Accordingly, appellant was under a duty to mitigate its damages.

The theory of "lost volume seller" is addressed in the *Restatement of Contracts, Second,* which provides that:

The mere fact that an injured party can make arrangements for the disposition of the good or services that he was to supply under the contract does not necessarily mean that by doing so he will avoid loss. If he would have entered into both transactions but for the breach, he has "lost volume" as a result of the breach. See Comment f to Section 347.

*Restatement of Contracts,* Second, Section 350, Comment d. Comment f of Section 347 states that:

If the injured party could and would have entered into the subsequent contract, even if the [first] contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract.

*Restatement of Contracts, Second,* Section 347, Comment f.

This court has never accepted the theory of "lost volume." In fact, this concept was summarily rejected by our court in *Unit Vending Corporation v. Dobbin Enterprises,* 194 Pa.Super. 470, 168 A.2d 750 (1961). In that case, this court held that a vending machine operator had a duty to minimize damages resulting from its customer's breach of an exclusive vending machine placement contract, and was not entitled to be compensated for any profits it might have obtained by placing the machine in another location. This court stated that:

[the plaintiff] should not be compensated for any profits that it might have been able to obtain by placing the machine in another location. It had the duty to minimize its damages by doing so if this were possible.

*Id.,* 194 Pa.Superior Ct. at 476, 168 A.2d at 754 (1961).

Furthermore, we decline appellant's invitation to now adopt this theory. The theory of "lost volume" erodes the duty to mitigate. Application of the doctrine would encour-

age the non-breaching party to do nothing to minimize its damages. Moreover, if compensation for "lost volume" was permitted, the non-breaching party would recover lost profits from the breached contract and the profits it would have made had it contracted with someone else. This directly conflicts with the purpose behind awarding contract damages.

> When there has been a breach of contract, damages are awarded in order to place the aggrieved party in the same position he would have been in had the contract been performed. The theory behind this philosophy is based on an attempt to make the non-breaching party whole again, not to provide him with a windfall.

*Bellefonte Area School District v. Lipner,* 81 Pa.Cmwlth. 334, 339, 473 A.2d 741, 744 (1984). Consequently, we reject appellant's request to adopt the theory of "lost volume." Moreover, we find that appellant did not fulfill its duty to mitigate damages. Appellant did not remove its machines from Flood's until September of 1984, almost seven months after P.D.O. stopped using them. Once removed, they were placed in a warehouse. Accordingly, the trial court did not err when it found that Northeastern had a duty to mitigate its damages which it did not fulfill.

### B.

Appellant next claims that even if we refuse to accept its theory of "lost volume", we must still increase its damage award to cover lost profits from the breach of the Northeastern–P.D.O. contract. We disagree.

To recover for lost profits there must be affirmative evidence that the loss resulted from the breach of contract. *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243 (1983). It is not necessary that the amount be shown with absolute or mathematical certainty, but only that it be approximated by competent proof. *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 525 A.2d 1215 (1987).

■ Northeastern did not prove its lost profits. The evidence of its alleged lost profits was mostly self-serving documents prepared for trial. Without concrete evidence, such as receipts signed by P.D.O. or verified readings of the meters on the vending machines, the evidence of lost profits was insufficient. Consequently, the trial court correctly assessed damages to be as follows:

The evidence in this case supports the fact that weekly payments in the amount of $125.00 were made by P.D.O. to Northeastern from the last week of August 1983 until February 1984, with the exception of a few weeks. The total amount of the loan was $5,000.00 and was to be repaid within one year at an interest rate of 18%. Using these figures the note would have been half paid at the time of the breach. In addition, the facts presented allow one to logically infer that Northeastern incurred incidental damages as a result of the breach in the form of storage costs for the machines, payroll expenses for its salesmen, and other general costs associated with doing business. Based on the aforementioned criteria, we assess damages in the amount of $2,500.00 (representing the remaining balance on the $5,000.00 loan plus 6% interest per annum from the time of the breach, $600.00) plus $1,500.00 incidental damages, totalling $4,600.00

Opinion, Vican, J., October 31, 1991, at 19. Accordingly, we affirm the judgment of the court below.

Judgment affirmed.