**SURE–TRIP, INC., Plaintiff–Appellant Cross–Appellee,**

v.

**WESTINGHOUSE ENGINEERING and Instrumentation Services Division, Defendants–Appellees,**

**Westinghouse Electric Corporation, Defendant–Appellee Cross–Appellant.**

Nos. 721, 875, Dockets 94–7619, 94–7637.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1994.

Decided Feb. 8, 1995.

David C. Douglas, Lockport, NY (Jackson, Wilson & Douglas, of counsel), for plaintiff-appellant-cross-appellee Sure–Trip, Inc.

Paul K. Stecker, Buffalo, NY (Phillips, Lytle, Hitchcock, Blaine & Huber, of counsel), for defendants-appellees and defendant-appellee-cross-appellant Westinghouse Engineering and Instrumentation Services Div., Westinghouse Elec. Corp.

Before: CARDAMONE, PIERCE, and MINER, Circuit Judges.

CARDAMONE, Circuit Judge:

Plaintiff Sure–Trip, Inc. appeals from a judgment entered on May 20, 1994 in the District Court for the Western District of New York (Curtin, J.) granting it damages against defendants Westinghouse Electric Corporation and its Westinghouse Engineering and Instrumentation Services Division (collectively Westinghouse). Plaintiff contends the district court erred when it calculated contract damages using taxable income as plaintiff's measure of lost profits. An earlier order by the same court, dated October 31, 1991, granted plaintiff summary judgment, holding that the contract between the parties had been breached by Westinghouse. Westinghouse cross-appeals from that determination of liability.

In one of his proverbs Benjamin Franklin capsulizes the truism that a little neglect can cause a good deal of mischief, saying that "for want of a Nail, the Shoe was lost; for want of a Shoe the Horse was lost; for want of a Horse the Rider was lost." *The Prefaces, Proverbs, and Poems of Benjamin Franklin, in* Poor Richard's Almanac for 1758, at 275 (G.B. Putnam's Sons 1889). The record on this appeal reveals Sure–Trip's neglect in presenting its financial records, for want of which, proof of expenses was lost; for want of proof of expenses, proof of damages was lost; for want of proof of damages, plaintiff's suit might well have been lost. Here however plaintiff will get a second chance to establish its damages, as we conclude the district court erred in granting summary judgment on the issue of liability. Accordingly, we reverse the order granting summary judgment insofar as it held Westinghouse liable for breach of contract, vacate the damage award to Sure–Trip, and remand for a new trial.

## BACKGROUND

### I Dealings Between the Parties

Sure–Trip, Inc., a Delaware corporation with its principal place of business at Olcott, New York, manufactures circuit breaker retrofit kits that are used to upgrade commercial electrical systems. Westinghouse is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. It uses retrofit equipment of the type manufactured by Sure–Trip, and itself manufactures similar kits. Beginning in March 1987 Westinghouse divisions around the

country periodically purchased small quantities of retrofit kits from Sure–Trip.

In the summer of 1987, because Westinghouse became interested in testing Sure–Trip's product and exploring continued purchases, its representatives contacted Sure–Trip officers, James Fitts and William Penniston. Fitts, Penniston, and a Sure–Trip technician met with a Westinghouse representative at Westinghouse headquarters in Pittsburgh and delivered a sample kit and company literature. On October 1, 1987 Westinghouse representatives, including Raymond Baranowski, the purchasing manager of the Westinghouse Engineering & Instrumentation Services Division, met with Fitts and Penniston at the Sure–Trip plant in Olcott. At this meeting, the quality and quantity of retrofit kits Sure–Trip was capable of producing and the possibility of Westinghouse purchasing kits in bulk quantities at a discount were discussed. Westinghouse indicated it could potentially use 1200 of Sure–Trip's kits in 1988. Sure–Trip assured Westinghouse it could produce that number.

On October 5, 1987 Penniston sent a letter to Baranowski proposing a "pricing structure exclusive to Westinghouse based on an average volumn [sic] of one hundred kits per month." Baranowski thereupon drafted a contract incorporating this pricing proposal, reflecting the parties' earlier discussion of a volume discount. The proposed contract stated that Pennsylvania law, including the Uniform Commercial Code as in effect in Pennsylvania, would govern its terms. Baranowski sent this document to Sure–Trip on October 12, 1987. Both parties executed it a few days later.

The dispute centers on Paragraph I of the contract, which provides:

a. [Westinghouse] agrees to purchase a minimum of 100 kits per month starting January 1, 1988 through December 31, 1988. The 100 kits per month minimum to be calculated on a three-month average. If in any three-month period [Westinghouse] does not meet this volume commitment, then Sure–Trip will invoice the difference to [Westinghouse]

between the 1987 list price of $889 and the contract price specified below.

\* \* \* \* \* \*

e. Pricing:

| | |
|---|---|
| 15 frame level without ground | $756.00 |
| 25 frame level without ground | $756.00 |
| 50 frame level without ground | $756.00 |
| 75 frame level without ground | $841.00 |
| 100 frame level without ground | Quote only |
| 15 frame level with ground | $799.00 |
| 25 frame level with ground | $799.00 |
| 50 frame level with ground | $799.00 |
| 75 frame level with ground | $844.00 |
| 100 frame level with ground | Quote only |

According to Baranowski, his aim in drafting Paragraph I was to permit Westinghouse to enjoy the proposed discounted prices if its purchases amounted to an average of 100 kits or more per month, with the price reverting to Sure–Trip's standard list price in the event that Westinghouse's purchases did not reach that level. Westinghouse commonly entered into similarly structured pricing agreements, and Baranowski stated that he crafted this contract by "paste and patch" from existing documents in his files. It was not his purpose, he averred, to commit Westinghouse to the purchase of any particular number of kits since he was not in fact authorized to commit his employer to the expenditure of more than $25,000 in any one contract.

Fitts and Penniston insist they understood the writing Baranowski sent them as committing Westinghouse to purchase 1200 retrofit kits in 1988. They understood Paragraph I as guaranteeing Sure–Trip quarterly "cash-flow protection" by providing that at the end of any quarter in which Westinghouse's purchases fell below 300 units, Sure–Trip could invoice Westinghouse for the difference between the $889 list price and the $756 discount price for 300 of the lowest-priced units—the difference being $133 times 300 or a total of $39,900—regardless of the number of units actually purchased.

As it turned out, Westinghouse only purchased 75 kits in all of 1988, paying the discount prices set forth in the contract. At the end of January 1988, at which point Westinghouse had purchased only 20 kits, Penniston sent a letter to Baranowski in response to defendant's negative engineering report on Sure–Trip's retrofit kits:

What does this mean? Is it a good product or not a good product. [sic] If we do not have a contract, please advise us so immediately so we may adjust our inventory and if we do have a contract, we would like a report from the Engineering Department accepting our product, and it being distributed [sic] to all Engineering Services Divisions.

A few months later, on May 3, 1988 Penniston sent Westinghouse an invoice accompanied by a letter stating

As it appears Westinghouse has no intent on [sic] fulfilling their portion of the agreement with Sure–Trip Inc., [sic] would you please process this invoice for immediate payment.

The invoice amounted to $12,655, the difference between list price and discount price for the kits Westinghouse had purchased between October 1987 and February 1988. Westinghouse disputed the portion of the invoice relating to 1987 purchases as being outside the October 1987 contract, and refused to pay it. Sure–Trip never invoiced Westinghouse further.

At some point in 1988 Sure–Trip contacted the Veterans Administration Medical Center (V.A.) in Milwaukee about submitting a bid for retrofitting circuit breakers. Sure–Trip included Westinghouse among its customer references. When the V.A. learned from Westinghouse during the summer of 1988 about the allegedly unsatisfactory engineering reports, it informed Sure–Trip that its product did not qualify for the retrofitting contract.

## II Sure–Trip's Suit

Sure–Trip sued Westinghouse in New York state court in April 1989 alleging five tort causes of action, including defamation, malicious interference and unfair competition, in connection with the V.A. contract. Defendant had the action removed to federal court in May 1989. In November 1989 plaintiff amended its complaint to allege a cause of action for breach of contract arising out of Westinghouse's failure to purchase the 1200 retrofit kits. Westinghouse moved for summary judgment as to the entire action, and

Sure–Trip moved for summary judgment on its contract claim.

The district court granted Westinghouse's motion with respect to Sure–Trip's original complaint and dismissed all of Sure–Trip's tort claims. On the remaining cause of action for breach of contract, the trial court found for Sure–Trip, ruling that Westinghouse had breached its contractual obligation. Focusing on the first sentence of Paragraph I.a., the trial court found Westinghouse was obligated to purchase 100 kits per month or a total of 1200 for 1988. It concluded that this sentence was unambiguous. The third sentence of Paragraph I.a., the district court continued, was inherently ambiguous, as it permitted alternative interpretations of the measure of damages intended by the parties. Accordingly, it granted plaintiff summary judgment on its breach of contract cause of action, and reserved the issue of damages for trial.

A bench trial on damages was held in December 1992. Sure–Trip elected to prove damages on a lost profits theory, as permitted by Pennsylvania's version of § 2–708 of the Uniform Commercial Code, 13 Pa.Cons. Stat.Ann. § 2708 (1984). Its evidence on this issue was limited to the testimony of its principals, Fitts and Penniston. Penniston stated that Sure–Trip sold 621 retrofit kits in 1988, and that the material, labor and packaging costs per kit totaled $225.97. Based on the lowest contract discount price of $756, Penniston calculated that Sure–Trip's profit would have been $530.03 on each of the remaining 1125 kits Westinghouse would have needed to buy to meet its volume commitment of 1200 kits, for a total lost profit of $596,283.75.

In contesting Sure–Trip's calculations Westinghouse offered into evidence Sure–Trip's 1988 tax return. The return showed a net taxable income of $11,954 derived from the sale of 621 kits. Sure–Trip's damage calculations thus amounted to a roughly five thousand percent increase in profits based on the purported 200 percent increase in sales had Westinghouse purchased the additional 1125 kits. Moreover, Westinghouse declared, Sure–Trip failed to offer evidence as to those expenses that might reasonably have

been expected to increase as a result of tripled production, such as utilities, overtime, new employee training and related administrative expenses, such as payroll.

To this argument, Fitts simply responded that none of these expenses would have gone up because the company was already operating at a "break-even" volume. Sure–Trip also offered testimony that Fitts' and Penniston's compensation would not have risen due to the company's increased profits, that no additional product testing would have been necessary, and that workers in the additional assembly shifts would be capable of operating without supervision. Fitts conceded that utilities might have increased slightly due to the increased production, but made no attempt to calculate the amount of such an increase.

On May 10, 1994 the district court held that the list price-contract price differential specified in the third sentence of Paragraph I.a. was ambiguous, that neither party intended that sentence to be interpreted as a liquidated damages clause, and that nothing else in the agreement spoke to damages. The trial judge believed that Sure–Trip, as a seller asserting a loss in the volume of its sales, was entitled under Pennsylvania law to seek lost profits. But because it had not adequately accounted for increases in overhead attributable to its putative increased production, the trial court concluded the plaintiff had failed to meet its burden of calculating lost profits.

Plaintiff's estimate of nearly $600,000 in damages was accordingly rejected. Instead, the district judge estimated Sure–Trip's damages based on the company's 1988 tax return. Dividing Sure–Trip's net taxable income of $11,954 by the 621 units it sold in 1988, it arrived at an estimate of $19.25 profit per kit. It then multiplied that figure by 1125, the number of additional units Westinghouse was required to buy under Sure–Trip's interpretation of the contract, to arrive at a total lost profit of $21,656.25. Judgment was entered in that amount, plus interest, costs and disbursements, in Sure–Trip's favor.

On appeal from this damages award Sure–Trip insists the district court's estimate of damages was inadequate because it unfairly deducted items attributable to fixed costs from the lost profits calculation. Westinghouse cross-appeals from the award of summary judgment on the issue of contract liability. It concedes that in the absence of a breach of the contract, it is liable for the contract price-list price differential for the 75 units it actually purchased in 1988, or $9,975.

## DISCUSSION

### I Calculation of Damages

#### A. *Applicable Law*

We turn first to plaintiff's contention that the district court erred in its calculation of damages. The governing principles of contract law are well settled in Pennsylvania. Damages for breach of contract are designed to put the non-breaching party in as good a position as it would have been in had the contract been performed. *See Maxwell v. Schaefer*, 381 Pa. 13, 112 A.2d 69, 73 (1955); *Northeastern Vending Co. v. P.D.O., Inc.*, 414 Pa.Super. 200, 606 A.2d 936, 938 (1992). The notion behind this theory is that damages should make the plaintiff whole.

Where plaintiff is seeking to recover lost profits, such damages are equal to the revenue that would have been derived, less additional costs that would have been incurred, in performing the contract. *See SHV Coal, Inc. v. Continental Grain Co.*, 376 Pa.Super. 241, 545 A.2d 917, 923–24 (1988), *rev'd on other grounds*, 526 Pa. 489, 587 A.2d 702 (1991); *Jessup & Moore Paper Co. v. Bryant Paper Co.*, 297 Pa. 483, 147 A. 519, 524 (1929). Fixed overhead costs, as opposed to variable costs, are not properly deducted in calculating plaintiff's lost profits. *See SHV Coal, Inc.*, 376 Pa.Super. 241, 545 A.2d at 923–24; *Jessup & Moore Paper Co.*, 147 A. at 524. Fixed costs represent the total dollar expense that occurs regardless of output. *See Jessup & Moore Paper Co.*, 147 A. at 524 (fixed costs are "charges necessarily involved in the general operation of [a] business, whether producing 90 or 100 percent").

In contrast, variable expenses, defined as those additional costs necessarily

incurred in performing the contract, must be deducted from plaintiff's recovery so plaintiff is not put in a better position than it would have been had defendant performed. Thus, Sure–Trip's alleged lost revenue had to be offset by any additional costs it would necessarily have expended in performing the contract to arrive at its lost profits. It was obliged with respect to the issue of damages to produce evidence regarding its increased costs, as plaintiff—in a breach of contract suit for lost profits—has the burden of establishing its damages by a preponderance of the evidence. *See Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983).

### B. *Proof in Instant Case*

■ Sure–Trip declared through its witnesses' testimony that its only increased costs would have been for labor, materials, and packaging, and that the company would have been capable of tripling production without any additional expenditures for administration, insurance, or machine repair, and only a minor increase in utility expense. Conceding that it would have been necessary to add at least one additional production shift to meet the increased demand, Sure–Trip insists it would have incurred no additional costs for payroll administration, overtime, or hiring and training new employees. The district court properly rejected this testimony as incredible. It found plaintiff had failed to meet its burden of accounting for and deducting increased expenses that would have been incurred in performance of the contract.

■ Given Sure–Trip's failure to meet its burden of proof, the district court would have been justified in awarding no damages. Instead, it turned to plaintiff's 1988 income tax return as the best available source of information regarding plaintiff's actual profit margin. Unlike the witnesses' testimony, the tax return reflected deductions for those items such as office supplies, utilities and machine repair that the company considered variable expenses. Pennsylvania law permits the court to "make a just and reasonable estimate of the damage based on relevant data." *Id.* Such evidence need not be complete or mathematically certain, so long as it provides a "reasonable basis" for calculation. *Id.* 464 A.2d at 1257–58.

Although the district court was entitled to rely on information included in plaintiff's tax return, it remains to be seen whether it incorrectly equated taxable income with profit. Sure–Trip maintains the trial court's approach conflated fixed and variable expenses because both are allowed as deductions from taxable income. In arriving at taxable income, Sure–Trip was permitted to deduct business expenses—such as rent and depreciation—that were part of its overhead, even though such expenses are not typically deducted in arriving at damages for lost profits, *see SHV Coal, Inc.,* 545 A.2d at 923–24; *see also Labar v. Labar,* 434 Pa.Super. 612, 644 A.2d 777, 780–81 (1994) (discussing relation between depreciation and net profit). Sure–Trip goes on to say that to arrive at its estimated profits, its taxable income ought to have been increased by the amount of those deductions it took for fixed business expenses.

A cursory examination of Sure–Trip's tax return reveals the difficulties involved in recasting the tax return into a profit and loss statement. To separate the deductions representing only fixed costs would necessarily lead to a significant degree of speculation. The deduction for rent is perhaps one clear example of an expense that would not have been likely to increase due to contract performance. Other deductions, such as those for advertising, travel, "patent expense" and depreciation, might fall into the same category. But items such as office supplies, bank charges, insurance and legal expenses are more problematic. A finder of fact might conjecture that such costs would have increased. Yet, assaying by what degree, without more evidence than was presented here, would be completely speculative.

For example, some of the most substantial deductions represent disguised compensation to Sure–Trip's principals, Fitts and Penniston: these include "subcontractor fees" of over $100,000, and a $15,000 "engineering consultation" fee, which was revealed at trial to be a personal expense of Penniston's. No evidence was introduced as to whether any of these costs represented compensation for

services that might have increased due to contract performance, other than the unsubstantiated assertions of these two witnesses.

In short, Sure–Trip, having failed to meet its own burden as to proof of damages, proposes shifting that burden onto the trial court, and would have us impose a requirement that the trial judge undertake an independent inquiry into such facts as it can unearth. The indefinite nature of this inquiry obviously is attributable in large part to Sure–Trip's failure to present reasonably reliable proof of its damages, transforming the difficulties of calculation, absent adequate proof, into an exercise of the finder of fact's imagination.

Also in the realm of fantasy was the rapacious damage figure that Sure–Trip's principals estimated at nearly $600,000. That outrageous figure was correctly set aside. Rather, the district court having nothing else before it used plaintiff's taxable income, which could be measured, instead of its lost profits, which could not. Any upward departure from taxable income based on setting aside those deductions held to represent fixed expenses would, as we have seen, be speculative. But plaintiff's taxable income does provide a useful "floor": the court could reasonably conclude that Sure–Trip's per-unit lost profits were no lower than its 1988 per-unit taxable income. Sure–Trip, having failed to meet its burden of proof, cannot now be heard to complain. Accordingly, were the size of the damage award the only issue before us, we would be inclined to affirm the judgment. But there is another issue—that of contract liability—to which we now turn.

## II Summary Judgment

### A. *Review of Its Grant*

 Westinghouse cross-appeals the summary judgment granted in favor of Sure–Trip on the issue of Westinghouse's breach of the contract. We review an award of summary judgment *de novo* and, resolving all ambiguities against the moving party, attempt to discover if there are any genuine issues of material fact left to be tried. *Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.

1994). Summary judgment is proper only when reasonable minds could not differ as to the import of the evidence. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

 Under Pennsylvania law, construing the language of a contract is a question of law. *See Meeting House Lane, Ltd. v. Melso,* 427 Pa.Super. 118, 628 A.2d 854, 857 (1993), *appeal denied,* 537 Pa. 633, 642 A.2d 486 (1994). The object of interpreting a contract is to ascertain and effectuate the intent of the parties as manifested by the language they chose to use. *See American States Ins. Co. v. Maryland Casualty Co.,* 427 Pa.Super. 170, 628 A.2d 880, 886 (1993); *O'Brien Energy Systems, Inc. v. American Employers' Ins. Co.,* 427 Pa.Super. 456, 629 A.2d 957, 960 (1993). Summary judgment is appropriate only if the contract language unambiguously conveys the intent of the parties. *Cf. Hershey Foods Corp. v. General Electric Service Co.,* 422 Pa.Super. 143, 619 A.2d 285, 288, *appeal denied,* 536 Pa. 643, 639 A.2d 29 (1993).

### B. *Summary Judgment in this Case*

 The district court found the contract plainly committed Westinghouse to a purchase of at least 1200 retrofit kits. In making this finding it focused on the first sentence in Paragraph I.a.: "[Westinghouse] agrees to purchase a minimum of 100 kits per month [in 1988]." Standing alone, the quoted terminology does have the unambiguous meaning the district court ascribed to it. Nonetheless, the intention of the parties is not derived from sentences or clauses read in isolation, but from the instrument as a whole. *See O'Brien Energy Systems, Inc.,* 629 A.2d at 960. Not only should the entire contract be considered, but its parts must be reconciled, if possible. *See Flatley v. Penman,* 429 Pa.Super. 517, 632 A.2d 1342, 1344 (1993), *appeal denied,* 537 Pa. 620, 641 A.2d 586 (1994). One part of a contract should not be read so as to render another part meaningless. *See Meeting House Lane, Ltd.,* 628 A.2d at 858.

It follows therefore that the meaning of Paragraph I.a. cannot be determined from its

first sentence alone. Also to be considered and given effect is its third sentence:

> If in any three-month period [Westinghouse] does not meet this volume commitment, then Sure–Trip will invoice the difference ... between the 1987 list price of $889 and the contract price specified below.

Westinghouse contends this sentence plainly provides for an alternate method of contract performance, that is, it is obligated *either* to buy at least 300 units per quarter at a discount *or* to pay the regular list price for however many units it purchases. This reflects a standard pricing arrangement, and is not an unreasonable interpretation of the contract. Upon this view, Westinghouse has not breached the contract; it simply owes Sure–Trip the difference between the list price and contract price for the 75 kits it did purchase. The district court's reading of the first sentence of Paragraph I.a. as imposing an absolute commitment on Westinghouse's part to purchase 1200 units unfortunately foreclosed this reading.

Another view of the same clause is that it represents a liquidated damages provision, according to which Westinghouse agrees to pay the full contract price as a penalty in the event of a breach. Sure–Trip rejects this view because a valid liquidated damages clause would prevent its recovery of a greater amount under a lost profits theory. *See* 13 Pa.Cons.Stat.Ann. § 2719 (1984). The district court found as a factual matter that neither party contemplated such a provision, and so it correctly rejected the liquidated damages interpretation.

The only remaining undiscussed alternative is Sure–Trip's argument that the clause gave it quarterly "cash flow protection" during the contract period. The clause, Sure–Trip maintains, guarantees it the list price-contract price differential for 300 units per quarter. But plaintiff concedes that such a reading of the clause is inherently ambiguous because the clause does not specify the number of units by which the price differential is to be multiplied. In addition, the impossibility of calculating the amount due under this reading of the clause is increased because the list price varies according to *which* unit is purchased; it cannot be determined with respect to units not purchased. For purposes of trial the parties stipulated that the differential was $133, but this amount cannot be substantiated from the face of the agreement.

▮ Thus, in turning to lost profits as an alternate measure of recovery, the district court essentially side-stepped the preliminary problem of resolving contract ambiguities. Taking the first sentence of Paragraph I.a. as an absolute commitment renders the third sentence either meaningless or hopelessly ambiguous. Although a written agreement must be construed against its drafter, *see Reilly Assocs. v. Duryea Borough Sewer Auth.*, 428 Pa.Super. 460, 631 A.2d 621, 623 (1993), this canon of construction will not be applied so as to deprive a contract of meaning. The problem remains of assigning some meaning and effect to the third sentence. When the language of an agreement is ambiguous, extrinsic evidence, including the circumstances surrounding the execution of the agreement and the parties' subsequent conduct, may be looked at to discover the intent of the parties. *See Department of Transp. v. IA Constr. Corp.*, 138 Pa.Cmwlth. 587, 588 A.2d 1327, 1330 (1991).

Extrinsic evidence of this kind was presented at trial. For instance, all the witnesses testified that the concept of "cash flow protection" was not discussed during contract negotiations, but that a volume discount was. Further, Sure–Trip did not attempt to collect the money allegedly owing it under its own interpretation of the agreement. At the end of the first quarter of 1988 Westinghouse had purchased only 28 kits, so Sure–Trip supposedly understood that it was entitled to recover the $133 differential times 300 kits, or $39,900, or at least the $133 differential times the 272 kits not purchased, or $36,176. But the invoice sent in May 1988 (including 1987 purchases) only amounted to $12,655.

If Sure–Trip's understanding was that it was entitled to invoice 300 times the pricing differential, it was rather surprising that it failed to bill Westinghouse for an amount that totaled about 330 percent of the company's entire annual income. In demanding only the price differential for the units actu-

ally purchased, Sure–Trip's May 1988 invoice appears to concede that Sure–Trip understood the agreement in exactly the same way as Westinghouse now urges.

In sum, it is not our task on appeal to determine the credibility of the different parties, or to weigh the probability of facts in the absence of a finding by the district court. We think the contract between Sure–Trip and Westinghouse was ambiguous as a matter of law, and therefore that unresolved issues of fact rendered a grant of summary judgment with respect to contractual liability improper.

## CONCLUSION

Accordingly, the order granting summary judgment to Sure–Trip on the issue of Westinghouse's breach of contract is reversed and the case is remanded to the district court for it to determine what the parties intended in forming their agreement. In making such determination, the district court may consider the extrinsic evidence as well as the actual language of the agreement. The damage award is also vacated. In the event that the court on remand determines that Westinghouse has breached its contract, plaintiff will have the burden of coming forward with sufficient evidence to allow the trial court to determine damages with a reasonable degree of certainty.

Reversed, vacated and remanded.