J.A30037/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

REZRO, INC., D/B/A AMERICAN ATM,     :     IN THE SUPERIOR COURT OF
    :        PENNSYLVANIA
            v.     :
    :
MAXIMO LANFRANCO D/B/A MAXI     :
GROCERY AND BANK EXPRESS     :
INTERNATIONAL, INC.     :
    :
APPEAL OF: MAXIMO LANFRANCO     :
D/B/A MAXI GROCERY     :     No. 107 EDA 2015

Appeal from the Judgment Entered February 9, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division No(s): October Term, 2013, No. 00297

BEFORE: MUNDY, JENKINS, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED FEBRUARY 12, 2016**

Appellant, Maximo Lanfranco, d/b/a/ Maxi Grocery, appeals from the

order entered in the Philadelphia County Court of Common Pleas finding in

favor of Appellee, Rezro, Inc., d/b/a American ATM, and against Appellant,

for breach of contract.[1]  The court entered a verdict in favor of Appellee in

---

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant purported to appeal from the December 4, 2014, order denying its post trial motion.  On January 26, 2015, this Court directed Appellant to praecipe the trial court Prothonotary to enter judgment on the decision of the trial court.  ***See Brown v. Phila. Coll. of Osteopathic Medicine***, 760 A.2d 863, 865 n.1 (Pa. Super. 2000) (appeal does not properly lie from order denying post-trial motions, but rather upon judgment entered following disposition of post-trial motions).  "Since judgment has now been entered, we will address the merits of [Appellant's] appeal." ***Johnston the Florist, Inc. v. TEDCO Const. Corp.***, 657 A.2d 511, 515 (Pa. Super. 1995) (*en banc*).  We have amended the caption accordingly.

the amount of $50,148.50.  Order, 11/20/14.  Appellant contends that he only agreed to be bound by a four year contract.  We vacate the judgment and remand.

The trial court[2] summarized the facts of this case as follows:

> [Appellee] filed a Complaint against [Appellant] alleging breach of contract with regards to an agreement titled "ATM Floor Space Lease" ("Agreement") to place [Appellee's] ATM machine in [Appellant's] grocery store . . . .  The Agreement was signed by both parties and commenced on January 2, 2009 with an initial term of 48 months.  Under Paragraph IV(A) and (B),[3] a new lease

---

[2] Judge Di Vito has retired from the bench and the case was assigned to Judge Idee C. Fox to write the Pa.R.A.P. 1925(a) opinion.

[3] Paragraph IV of the lease provides, in pertinent part,  as follows:

> IV. LENGTH OF AGREEMENT
>
> (A) The ATM must stay on the installed position for the entire term unless removed or moved in compliance with this or other sections of this agreement.  The length of this agreement shall be for forty-eight (48) months from commencement date.  Unless cancelled in accordance with section IV(B), a new lease term will commence at the end of the previous term.
>
> (B) Proper notice shall be deemed given if either [Appellant] or [Appellee] gives written notice to the other party, at least one hundred twenty (120) days before the end of the current ATM Placement Agreement, indicating that no further agreement will be entered into.

R.R. at 70a.  For convenience we refer to the reproduced record where applicable.  **See generally** Pa.R.A.P. 2156.

term of 48 months would commence if no written notice or termination was provided 120 days prior to the termination of the initial term ("Renewal Provision"). . . .

[Appellee] did not receive written notice of termination during the initial term. The Agreement therefore automatically renewed for another 48 month period starting January 2, 2013. However, in July 2013, [Appellant] unplugged [Appellee's] ATM and placed another company's ATM in the store.

The matter proceeded to a Non-Jury trial before Judge [Gary F.] Di Vito on November 17, 2014. . . . Following trial, Judge Di Vito entered Findings and Conclusions, explaining his reasons for finding in favor of [Appellee] and against [Appellant] and assessing damages of $50,148.50. . . . Judge Di Vito's Findings and Conclusions are attached hereto and incorporated herein.

R.R. at 8a-9a (footnote omitted).

Judge Di Vito made the following, *inter alia*, findings of fact:

3. Christopher Mirzai ("Mirzai") is an authorized representative of [Appellee].

\* \* \*

9. [Appellee] provided the ATM machine which was placed in [Appellant's grocery] and maintained the machine and during the relevant period, [Appellee] monitored the functioning of the machine and continually ensured it was properly operating and stocked with cash.

10. [Appellee] collected a surcharge on transactions conducted at the machine. In addition to this surcharge, [Appellee] received an interchange payment[4] on the transactions processed by the machine.

---

[4] In ATM transactions, interchange is the fee that financial institutions that issue debit cards pay the ATM owner in exchange for the convenient access to customers' bank accounts.

12. At no time during the initial term of the lease agreement did [Appellee] receive any written notice of cancellation or termination of the Lease Agreement from [Appellant] in accordance with [sic] as required under paragraph IV of the lease.

13. Under Paragraph IV(A) of the Lease Agreement, the contract was automatically renewed on January 2, 2013 for another term of forty eight (48) months.

14. The Lease Agreement contains a "Non-Competition" provision which states that [Appellant "]agrees not to possess, cause to be placed or operate any other ATM or cash back device on the premises throughout the term of the agreement.["]

15. In or about July 2013, [Appellant] permitted another company's ATM to be placed in the store and unplugged [Appellee's] ATM.[5]

\* \* \*

19. [Appellee] incurred a loss of **future income** in the amount of $50,148.50.

R.R. at 2a-4a. The trial court's conclusions of law were as follows:

1. The lease between the parties is a valid contract.

2. The lease renewed at the end of the initial forty eight (48) month term pursuant to section IV(a) [sic] thereof.

3. [Appellant] is in breach of the terms and conditions of the lease.

4. The [c]ourt found Christopher Mirzai credible.

---

[5] It is undisputed that on July 24, 2013, Appellant disconnected Appellee's machine. Appellant's Brief at 10. Appellant "placed another ATM in the store . . . ." **Id.**

5. The [c]ourt found [Appellant] not credible.

6. [Appellee] is entitled to recovery of its losses.

R.R. at 4a-5a. The court entered a verdict in favor of Appellee in the amount of $50,148.50. *Id.* at 5a.

Appellant filed post trial motions, which were denied. This timely appeal followed. Appellant filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal[6] and the court filed a responsive opinion.

Appellant raises the following issues for our review:

> 1. Whether there was a meeting of the minds on the renewal provisions of the Contract?
>
> 2. Whether there was a failure of consideration for the renewal provisions in the Contract?
>
> 3. Whether the Contract created a license that was revocable at will rather than a lease that was binding for an additional four year term?
>
> 4. Whether [Appellee] suffered damages that are cognizable under Pennsylvania Law as a result of the alleged breach of contract?
>
> 5. Whether the renewal provisions of the Contract should have been voided due to unconscionability?

Appellant's Brief at 4-5.

---

[6] We note that Appellant's Rule 1925(b) statement contained eleven issues. We will not consider any issue if it has not been set forth in the statement of questions involved. These claims are abandoned on appeal. *See City of Phila. v. Schweiker*, 858 A.2d 75, 90 (Pa. 2004).

At the outset, we address issue number four because it is dispositive. Appellant contends that Appellee did not suffer damages that are cognizable as a result of the alleged breach of the renewal provisions of the contract.[7] Appellant's Brief at 20. Appellant avers "the trial court erred by creating a liquidated damage award of gross profits" projected over three and a half years. *Id.* at 25. Appellant argues the trial court erred in finding that the "loss of future income in the amount of $50,148.50" was a "credibility determination."[8] *Id.* at 26.

In **Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.**, 98 A.3d 645 (Pa. Super. 2014), *appeal denied*, 117 A.3d 1281 (Pa. 2015), this Court stated that the question of **how** to calculate damages is a question of law, citing **Helpin v. Trustees of Univ. of Pa.**, 10 A.3d 267, 270 (Pa. 2010). **Newman**, 98 A.3d at 656 (emphasis added). The "standard of review is *de novo* and [the] scope is plenary." **Helpin**, 10 A.3d at 270.

In **Northeastern Vending Co. v. P.D.O., Inc.**, 606 A.2d 936 (Pa. Super. 1992), this Court opined:

> Specifically, appellant recognizes that there is a general duty to mitigate in cases involving commercial transactions, but contends that such a duty is inapplicable where the non-breaching party is a "lost volume seller."

---

[7] Appellant avers that he entered into a four-year contract with Appellee. Appellant's Brief at 13.

[8] R.R. at 17a.

However, **this Commonwealth does not recognize the theory of "lost volume seller." Accordingly, appellant was under a duty to mitigate its damages.**

The theory of "lost volume seller" is addressed in the *Restatement of Contracts*, Second, which provides that:

> The mere fact that an injured party can make arrangements for the disposition of the good or services that he was to supply under the contract does not necessarily mean that by doing so he will avoid loss. If he would have entered into both transactions but for the breach, he has "lost volume" as a result of the breach. *See* Comment f to Section 347.

*Restatement of Contracts*, Second, Section 350, Comment d. Comment f of Section 347 states that:

> If the injured party could and would have entered into the subsequent contract, even if the [first] contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract.

*Restatement of Contracts*, Second, Section 347, Comment f.

**This court has never accepted the theory of "lost volume."** In fact, this concept was summarily rejected by our court in ***Unit Vending Corp[.] v. Dobbin Enter[.]***, [ ] 168 A.2d 750 ([Pa. Super.] 1961). In that case, this court held that a vending machine operator had a duty to minimize damages resulting from its customer's breach of an exclusive vending machine placement contract, and was not entitled to be compensated for any profits it might have obtained by placing the machine in another location. This court stated that:

> [the plaintiff] should not be compensated for any profits that it might have been able to obtain by

placing the machine in another location. It had the duty to minimize its damages by doing so if this were possible.

*Id.*, [ ] at 754.

Furthermore, we decline appellant's invitation to now adopt this theory. The theory of "lost volume" erodes the duty to mitigate. Application of the doctrine would encourage the non-breaching party to do nothing to minimize its damages. Moreover, if compensation for "lost volume" was permitted, the non-breaching party would recover lost profits from the breached contract and the profits it would have made had it contracted with someone else. This directly conflicts with the purpose behind awarding contract damages.

> When there has been a breach of contract, damages are awarded in order to place the aggrieved party in the same position he would have been in had the contract been performed. The theory behind this philosophy is based on an attempt to make the non-breaching party whole again, not to provide him with a windfall.

*Bellefonte Area School District v. Lipner*, [ ] 473 A.2d 741, 744 ([Pa. Cmwlth.] 1984).[9] Consequently, we reject appellant's request to adopt the theory of "lost volume." **Moreover, we find that appellant did not fulfill its duty to mitigate damages. [The a]ppellant did not**

---

[9] We note that

> [t]his Court is not bound by decisions of the Commonwealth Court. *Citizens' Ambulance Service Inc. v. Gateway Health Plan*, 806 A.2d 443, 446 n. 3 (Pa. Super. 2002)[.] However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate. *Id.*

*Maryland Cas. Co. v. Odyssey Contracting Corp.*, 894 A.2d 750, 756 n.2 (Pa. Super. 2006).

> **remove its machines from Flood's until September of
> 1984, almost seven months after P.D.O. stopped
> using them. Once removed, they were placed in a
> warehouse**. Accordingly, the trial court did not err when
> it found that **Northeastern had a duty to mitigate its
> damages which it did not fulfill.**

*Northeastern Vending Corp.*, 606 A.2d at 938-39 (emphases added).

Although a party cannot recover lost volume, it could recover lost

profits. *Id.* at 939.

> To recover for lost profits there must be affirmative
> evidence that the loss resulted from the breach of
> contract. It is not necessary that the amount be shown
> with absolute or mathematical certainty, but only that it be
> approximated by **competent proof**.

*Id.* at 939 (citations omitted and emphasis added).

Instantly, the trial court opined:

> [Appellant] contends [Appellee] did not suffer any losses
> and therefore Judge Di Vito erred by ruling [Appellee] was
> entitled to recover losses. However, **Judge Di Vito made
> a credibility determination and found that [Appellee]
> suffered a loss of future income in the amount of
> $50,148.50. Without offering an opinion on Judge Di
> Vito's findings, this court will not disturb them**.

R.R. at 17a (emphases added). We find the trial court erred.

On March 21, 2014, Appellant served interrogatories and requests for

production of documents on Appellee. Interrogatory number four stated:

> Describe the basis for your damages claims. State the
> total dollar amount you claim to have lost as a result of
> [Appellant's] alleged breach of agreement with [Appellee].
> Provide subtotals for all categories of alleged losses. For
> the total and for each category, describe with particularity
> all facts that substantiate your claim of damages. Identify

all documents that support each and every aspect of your damages claims.

[Appellant's] Interrog. and Req. for Produc. of Doc. Addressed to [Appellee], 3/21/14, at 3 ¶4.

In response to interrogatory four, Appellee stated:

See damages sheet. Loss is projected based on expected receipt of two revenue sources. First is direct surcharging to customers and second is interchange revenue derived from the debit networks paid directly to [Appellee]. All losses are projected forward based on historical averages and the reasonable expectation of similar future conditions. Documents include interchange and transaction summary for the 12 months previous to disconnect.

Answers and Objections to [Appellant's] Interrog. Addressed to [Appellee] (First Set), 5/1/14, at 5 ¶4.

Interrogatory number five stated:

Provide the date that the ATM was removed from [Appellant's] premises; and the whereabouts of the machine at all times since it was removed from [Appellant's] premises. Identify all locations where that machine was installed. State the amount of income that machine has garnered for [Appellee] since it left [Appellant's] premises. Identify all documents relevant to your response.

[Appellant's] Interrog. and Req. for Produc. of Doc. Addressed to [Appellee] at 3 ¶5.

In response to interrogatory five, Appellee stated:

**Machine removed in January 2014. Machine is currently in storage and is slated to be used for parts.** The ATM has generated no revenue because

placing older machines in new locations is nearly always rejected by a new location.

Answers and Objections to [Appellant's] Interrog. Addressed to [Appellee]

(First Set) at 5 ¶5 (emphasis added).

Interrogatory number 6 stated as follows:

**Describe in detail all efforts you took to mitigate your alleged damages claims, if any**.  State whether or not such efforts were successful.   Identify all witnesses with knowledge of **your attempt(s) to mitigate**. Identify all documents relating to **your attempts to mitigate**.

[Appellant's] Interrog. and Req. for Produc. of Doc. Addressed to [Appellee]

at 4 ¶6 (emphases added).  In response, Appellee averred as follows:

New locations want new machines.  This machine, because of its years in tough neighborhoods, shows wear that new locations do not want.  We have had other machines from locations we have lost prior to [Appellant] that have gone into locations that on rare occasion, did accept an older machine.

Answers and Objections to [Appellant's] Interrog. Addressed to [Appellee]

(First Set) at 6 ¶6.

Christopher Mirzai was deposed on July 25, 2014.  He was asked about interrogatories five and six.  He testified, *inter alia*, as follows:

Q:  . . .Paragraph 5 there, the question is, when was it removed and where is it now, essentially.  Your answer was January '14, and it's in storage and being used for parts.

A: Nothing new.

Q:Well, if you go to paragraph 6 on the next page, it looks like you're saying that you couldn't place that machine anywhere because it was beat up?

A: Correct.  Cosmetically.

Q: It had many years in a tough neighborhood and showed wear?

A: Right.  People Graffiti it.  They write on the machine. They'll scratch it and do many things to make it cosmetically unappealing.

Q: Was there graffiti on this machine?

A: Yes, probably.

N.T. Dep., 7/25/14, at 34.[10]

At trial, Christopher Mirzai, director of operations for Appellee, testified regarding the damages as a result of the alleged breach of the agreement.  R.R. at 20a, 24a.  The court was shown a chart which Mirzai described as

> attempting to show the [c]ourt our anticipated—well our damages as a result of the breach of agreement.
>
> If I go by column, again, the terminal number relates to the unique terminal identifier for [Appellant's] grocery, Maxi Grocery.
>
> Location is the name of the grocery.
>
> Settlement date, we see here each row under settlement date relates to month and year.  So June '12, July '12, August '12, all the way to June 2013, which is the last full month the machine was in operation since it was disconnected.  I believe.  July 24th of 2013.  So we didn't include that.

---

[10] We note that the deposition was not included in the reproduced record.

But it essentially, shows about a year's worth of historical data for that machine from the last full month of operation for approximately 13 months.

[Appellee's Counsel]: . . . Then, explain to the Court the surcharge withdraws, the total surcharge column, and the interchange column.

A: . . . The surcharge withdraws . . . were the number of times people took money and were imposed the surcharge, which was a $1.75, at that location.

So if you multiply $1.75 times the surcharge withdraws, you should reach the total surcharge number.

Interchange are funds that are paid directly to us by the networks that's not shared to the location, but is additional revenue that all ATM companies receive.

Q: So then, for the prior 12 months before the contract was terminated, there was an average of 759—or a little more time—withdrawals—for the

A: Thirteen months. Approximately, 759. So round up or down.

Q: —right. . . .

A: Those were the approximate number of withdrawals in a given month as an average for the previous year.

Q: And the average of the interchange [Appellee] received per month was $267.58?

A: That's correct.

Q: Now, move down to the second box and explain the split and how you calculated or took out of the interchange fees, what would have been paid to [Appellant].

A: Well, not the interchange. It would be the surcharge.

Q: . . . The surcharge, yes.

- 13 -

A: Again, the total surcharge is 1.75, the location—or the agreement was to receive 50 cents of that.

So if you take 50 cents, multiply that by the 759.69 average number of surcharge withdrawals, you would get an average monthly payment to the location of $379.85. Using that same formula, on an average month, the ATM Company, [Appellee] would receive 949.62.

And again, the interchange is not shared, so that average of $267.58 would be received by [Appellee]. So the totals indicate for, at least [Appellee], the sum of those two revenue sources and for the location, the amount of their checked [sic] based on the average that was calculated.

Q: . . . So the, if you found out these numbers, [Appellee] **would have received, approximately, 1,217.20 per month for the proceeding 13 months**.

A: Correct. On average. That's how much we did receive.

Q: On average. Okay. And how do you get to the total amount of damages there? Can you explain the next line, please?

A: . . . **The total amount of damages were, essentially, the number of months remaining on the agreement multiplied by the number of the average loss revenue per month, which came out to $50,148.51.**

*     *     *

Q: Now, this particular machine that was in the store that had been in the store—the same physical piece of equipment—from before [Appellant] took over the store in 2008, 2009, is that correct?

A: Yes.

Q: . . . And you didn't do anything out of the ordinary to the machine more than 120 days before the four years had run, isn't that correct?

- 14 -

A: I'm not sure—can you repeat the question?

Q: . . . Did you have in your calendar the 120th day before the contract expired? Did you keep track of that?

A: I don't have—we don't have reminders for that.

Q: And you don't have anything special in mind to do with the machine when that time comes?

A: Special—I'm not sure—if the machine needs replacing or if the machine needs services done when it's needed, it's not—we don't wait for 120 days prior to the expiration term to do it if it's six months before it needs it.

Q: So it makes no difference to you about when this 120—day period had come and gone. You were doing exactly what you would have done no matter what [Appellant] would have told you?

A: Well, we needed to—first of all, we needed to know our cash needs; if we have this location or not; if we needed to go find another location to replace this one; if we have to adjust our crew.

These are all things that when we have advanced notice, we are able to anticipate the staffing levels, the inventory levels, cash of machines, of parts. This is not in and of itself—all of these, in aggregate, matter to us.

So in terms of exactly this machine—120 days before, did we do anything special? I do not recall doing anything specific prior to the renewal.

\* \* \*

Q: And this particular machine had a lot of graffiti on it?

A: It does have graffiti on it. It gets cleaned periodically. But sure. People do vandalize, you know, these neighborhoods that this machine is in, it's not—it's prone to that type of activity.

J.A30037/15

R.R. at 24a-25a, 29a-30a (emphases added).

Instantly, it is undisputed that Appellee removed the ATM machine in January of 2014, approximately six months after it was disconnected by Appellant. Appellee then placed the ATM machine in storage. Appellee had a duty to mitigate its damages. *See Northeastern Vending Co.*, 606 A.2d at 938-39. We find the trial court erred in finding that Appellee was entitled to damages for a loss of **future income** in the amount of $50,148.50. *See id.* Accordingly, we vacate the judgment and remand to the trial court for a determination of whether Appellee fulfilled its duty to mitigate its damages and provided competent proof of lost profits. *See id.*

Judgment vacated. Case remanded. Jurisdiction relinquished.

Mundy, J. joins the Memorandum.

Jenkins, J. files a Concurring Memorandum in which Mundy, J. joins.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/12/2016

- 16 -