**In re WILBAR REALTY, INC., Debtor.**

**Wilbar Realty, Inc., Plaintiff,**

**v.**

**Pennsylvania Infrastructure Investment Authority, Defendant.**

Bankruptcy No. 5–00–01242.
Adversary No. 5–01–ap–00088.

United States Bankruptcy Court,
M.D. Pennsylvania.

March 16, 2005.

David J. Harris, Wilkes–Barre, PA, for Debtor.

Robert P. Sheils, III, Sheils Law Associates PC, Clark Summit, PA, pro se.

## *OPINION*

JOHN J. THOMAS, Chief Judge.

This litigation was initiated by the Debtor, Wilbar Realty, Inc., against the Pennsylvania Infrastructure Investment Authority ("PENNVEST"). While arising prepetition, the parties agreed that this Court should have jurisdiction to issue a final decision pursuant to 28 U.S.C.A. § 1334(b), 28 U.S.C.A. § 157(c)(2), and Standing Order 00–3 of the United States District Court of the Middle District of Pennsylvania.

Wilbar is a small, locally-owned water company servicing approximately 230–300 customers in Luzerne County, Pennsylvania. (Transcript of 6/4/02 at 18 and 220 (Doc. # 40).) Wilbar was subject to oversight by the Pennsylvania Public Utility Commission (PUC). Due to its deteriorating infrastructure, Wilbar found itself required to upgrade but unable to obtain conventional funding.

PENNVEST is a governmental authority established to come to the aid of various governmental or regulated entities by assisting with funding projects where conventional funding may be either unavailable or inordinately expensive. Moneys loaned by PENNVEST are returned to PENNVEST on an amortized schedule and recirculated to others in need of similar assistance. (Transcript of 8/23/02 at 67 (Doc. # 45).) Typically these PENNVEST loans are on terms favorable to the borrower.

It was under these circumstances that PENNVEST found itself extending $1,381,549 [1] in funds to Wilbar to allow reconstruction of its water system. In addition to this loan, Wilbar was also the recipient of a $250,000 PENNVEST grant toward the installation of water lines and the treatment facility. It was the very manner in which the transfer of funds occurred that led Wilbar to initiate this litigation on the principle grounds that PENNVEST breached the covenant of "good faith" in the manner in which it dealt with Wilbar.

The trial took place over four days stretched sporadically throughout the Court's calendar. Eight witnesses testified. The Plaintiff presented the testimony of Wilbar principal, Carl Kresge, and Plaintiff's expert, Gary Shambaugh. The evidence that emerged was that: (1) the Wilbar project was constructed by Carl Kresge and Sons, Incorporated; (2) Carl Kresge was the principal of both Wilbar Realty, Inc. and Carl Kresge and Sons, Inc.; (3) payments made by the lender PENNVEST were typically untimely per the contract; (4) Carl Kresge was a difficult individual to communicate with and succeeded in alienating much of the PENNVEST staff; and (5) the most significant concern of Wilbar was the failure of PENNVEST to provide a "final amortization schedule" so that the schedule could be used, by Wilbar, to justify a rate hike request before the PUC.

Much testimony was presented regarding the acrimony and constant disputes that arose between the parties as to the work performed and the supporting documentation furnished by Wilbar in support of requests for advances on the loan. This dispute was presumably resolved by agreement on April 26, 1995 when the parties agreed to be bound by a valuation to be

---

1. PENNVEST claims the loan obligation was $1,392,762. (Defendant's Amended and Re- stated Post–Trial Brief at 2 (Doc. # 57).)

performed by the independent consultant, Buchart–Horn, Inc. (Defendant's Exhibit No. 26.) That report, referenced as a "Post Construction Review and Cost Estimate Report", was finalized on June 14, 1995 and concluded that the value of the system was $1,323,318[2], excluding profit and cost of bond. (Defendant's Exhibit No. 27.) The cost of bond was not added because Carl Kresge and Sons did not purchase a bond and profit was disallowed since profit was not contemplated by the parties. (Defendant's Exhibit No. 89.) A review of the Report makes apparent that the "value", as utilized by Buchart–Horn, equated with its cost estimate. Having agreed to be bound by the Buchart–Horn estimate, Wilbar effectively capped its demand for funding by PENNVEST at that base number. Together with additional adjustments, PENNVEST calculated that Wilbar had "final project costs" of $1,594,450.80, together with unpaid interest through August 1, 1996 of $23,299.22, less the $250,000 grant so as to allow for a total PENNVEST loan of $1,367,750.02. (Defendant's Exhibit No. 36, Attachment No. 1.) It was, roughly, this sum that was amortized by PENNVEST on August 16, 1996. (Defendant's Exhibit No. 36.)

### LIABILITY

While the testimony was sketchy, Wilbar categorizes four general areas of liability as follows: (1) untimely advances on the loan by PENNVEST; (2) failure to make the final advance on the loan by PENNVEST; (3) failure to certify completion so that final amortization could be provided and eventually submitted by the Plaintiff to the PUC in support of a rate hike; and (4) breach of the implied covenant of good faith.

This action involves a Pennsylvania contract, and as such, implicates Pennsylvania law. See *F.D.I.C. v. Firemen's Ins. Co. of Newark, NJ*, 109 F.3d 1084, 1087 (5th Cir.1997)("We look to state law for rules governing contract interpretation."). Moreover, the contract specifies that it shall be governed by Pennsylvania law. (Defendant's Exhibit No. 1, page 33.)

### UNTIMELY PAYMENTS

Much of Wilbar's case complains of the "untimely" progress payments ostensibly made by PENNVEST, which had the immediate result of forcing Kresge to secure and utilize a personal line of credit to fund continuing construction.

The Loan Agreement between PENNVEST and Wilbar dated September 4, 1991, (Defendant's Exhibit No. 1), provides, on page 22 thereof, that "On or about twenty-one (21) business days after receipt of an Application [for disbursement], the Authority [PENNVEST] will disburse or advance the amount requested provided that any inspections by consulting engineers or architects satisfactory to the Authority verify those representations and certifications required to be set forth in the Applications pursuant to subparagraph (b) hereof and provided that all other conditions precedent to such disbursements and advances set forth in this agreement have been satisfied."

During the trial, the Plaintiff put forth vague testimony as to specific delays attendant with each payment. Nevertheless, PENNVEST submitted Defendant's Exhibit No. 40 demonstrating the time lapse between receipt of the Wilbar Application and the date PENNVEST sent the Application to the Pennsylvania Comptroller for payment. The Exhibit also sets forth the

---

**2.** This number was subsequently adjusted upward by $7,576 to $1,330,894. See Defendant's Exhibit No. 53.

time the Comptroller had the Application before it was paid.

Specific testimony on the timeliness of these payments was offered at trial by PENNVEST witness, Heather Myers. The parties agreed that at least eight of the twenty-one payments were timely[3], eight others were late[4], one was not paid[5], and disputes existed regarding the timeliness of four of the payments[6]. (Transcript of 7/24/02 at 114–145 (Doc. # 42).)

PENNVEST argues that the delay in paying Payment Request No. 10 was a result of inadequate backup information, a position adequately supported by the trial record. The delay in honoring Payment Request No. 15 is more problematic. PENNVEST argues that an "escape clause" in the Commitment letter, (Defendant's Exhibit No. 78, ¶ 14(e)), allows PENNVEST to renege on the loan if their funding from state bonds is jeopardized. PENNVEST advances that since Wilbar[7] used a private line of credit to pay some bills, then reimbursing Wilbar could have jeopardized the tax free status of the state bonds. Ergo, PENNVEST waited until its counsel advised them of the propriety of this transaction before paying Wilbar. Unfortunately for PENNVEST, the record lacks any evidence that PENNVEST attempted to determine what portion, if any, of Wilbar's reimbursement request may have been prepaid by a line of credit. In fact, my impression from the testimony was that Wilbar prepaid very little of its bills prior to receiving reimbursement for incurred expenses from PENNVEST.

In considering the attendant delays associated with Payment Requests Nos. 19 and 20, it becomes apparent that PENN-VEST had sufficient concern after an inspection to request an audit before releasing further funds. Considering the testimony and accepting it as uncontroverted, it appears that the delays in reimbursing Payment Nos. 10, 19 and 20 were justified for reasons set forth on the record. (Transcript of 9/25/02 at 20 (Doc. # 46).) I further find that other late payments, as set forth in Appendix 1, were not timely advanced by PENNVEST.

### PENNVEST'S FAILURE TO MAKE THE FINAL ADVANCE

As the Plaintiff argues, the delay in reimbursing Wilbar required Wilbar to utilize its own line of credit with a private institution at interest rates of 9% and 11%. Reimbursement of these interest payments by PENNVEST exhausted the PENN-VEST credit line, thus preventing Wilbar from being repaid by PENNVEST for its final construction draw of $78,861.

As alluded to, PENNVEST had exhausted its loan commitment by advancing funds, not only for construction costs, but in reimbursement of interest expenses. Since reimbursement of interest was a legitimate claim under the loan documentation, it appears that Wilbar had simply exhausted the loan commitment so as to prevent further advances. The Plaintiff's argument that additional advances on the loan should have been made appears unsupportable.

---

3. Payment Request Nos. 5, 6, 10–13, 16, 17 and 20. See Defendant's Exhibit No. 40.

4. Payment Request Nos. 1–4, 7–9, and 18.

5. Payment Request No. 21.

6. Payment Request Nos. 10, 15, 19, and 20.

7. The line of credit appears to have been extended by the banking institution to Carl Kresge and his spouse Dorothy Kresge, who then, presumably, advanced that fund to Wilbar and eventually its creditors. See Transcript of 6/4/01 at 41.

### PENNVEST'S FAILURE TO PROVIDE FINAL CERTIFICATION AND INITIALIZE A FINAL AMORTIZATION SCHEDULE

Regarding the circumstances surrounding the final documentation for the project that required the submission of engineering charts *under seal* (Defendant's Exhibit No. 31), Brian Johnson, PENNVEST Deputy Director for Project Management, testified that the submission was inadequate because the plans lacked the official seal of the engineer. No PENNVEST witness could testify that this deficiency was ever communicated to Wilbar. See, e.g., Transcript of 9/25/02 at 186 (Doc. # 46).

Considering the apparent abrasiveness of Wilbar's principal Carl Kresge, which was uniformly testified to by PENNVEST witnesses, the option given to PENNVEST employees not to speak to Kresge [8] seems quite reasonable. However, it is not that to which I raise concern. It appears manifestly unreasonable for PENNVEST to receive documentation from Wilbar and fail to communicate to Wilbar with regard to its perceived inadequacies. While telephonic communication may be inadvisable, no explanation was given why PENNVEST would not notify Wilbar, in writing, of the documentation's shortcomings.

I find, while it may have been reasonable to discontinue oral communications with the Wilbar principal, this directive "necessarily implied" future communications would be in writing. Any other conclusion would not be justified. PENNVEST's failure to communicate with Wilbar its submission of final plans without an engineer's seal was defective, was unwarranted. Affixing a seal may have been no more than a ministerial act, but it ostensibly resulted in PENN-

VEST's failure to supply Wilbar with a final amortization schedule.

It appears undisputed that an amortization schedule was essential so that Wilbar could apply to the PUC for a rate hike approval. What appears to be in dispute is whether the *final* amortization schedule alluded to was a necessary ingredient of that request. PENNVEST's Brief makes references to *interim* amortization schedules utilized by Wilbar in obtaining rate increases. See, e.g., testimony of Carl Kresge, Transcript of 6/4/02 at 159 (Doc. # 40). Of course, the question arises as to whether this vehicle, i.e., an interim amortization schedule, was a sufficient tool to mitigate whatever damage Wilbar suffered. The record is incomplete on this point and cannot support liability.

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

■ Wilbar alleges that PENNVEST's failure to cooperate with Wilbar, its employees, consultants, and attorneys, constitutes a breach of the implied covenant of good faith present in every contract. In *In re Clemens,* I addressed the covenant of good faith as it is recognized in Pennsylvania, as follows:

> The seminal case on good faith under Pennsylvania law is *Creeger Brick and Building Supply Inc. v. Mid–State Bank and Trust Company, SEDA,* 385 Pa.Super. 30, 560 A.2d 151 (1989). *Creeger* acknowledges that the duty of good faith has been recognized in the Commonwealth of Pennsylvania in limited situations. *Id.,* 560 A.2d at p. 153. That case cites to Section 205 of the Restatement for the proposition that "... [e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Id.,* 560 A.2d at p. 153.

---

8. Transcript of 8/23/02 at 158 (Doc. # 45).

The *Creeger* case involved a borrower suing its lending bank for failing to provide Creeger with a line of credit, over-collateralizing its loan, establishing a commercially unreasonable method in which Creeger was required to draw upon borrowed funds, etc. After an analysis of the law in Pennsylvania, the *Creeger* court wrote as follows:

It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself. As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons. A lending institution also is not required to delay attempts to recover from a guarantor after the principal debtor has defaulted. Finally, if the bank in this case falsely represented appellants' financial circumstances to other creditors for the purpose of damaging appellants' ability to continue doing business, appellants may have causes of action in tort for slander, misrepresentation, or interference with existing or prospective contractual relations. There is no need in such cases to create a separate tort for breach of a duty of good faith. *Id.*, 560 A.2d at p. 154.

While not categorically denying the existence in Pennsylvania of a tort for breach of a duty of good faith, the *Creeger* court suggested that its application was extremely limited and would probably only be allowed on occasions where a party had no other redress for a harm caused by the inequitable conduct of a defendant.

Further supporting this conclusion is *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685 (3rd Cir.1993), wherein our circuit predicted that "... the Pennsylvania Supreme Court would not extend the limited duty of good faith to a situation such as the one at bar in which *there already exists an adequate remedy at law.*" [Emphasis ours.] *Id.* at p. 701.

The circuit concluded that since the Plaintiff could seek relief under an established cause of action, there was no reason to imply a separate tort for breach of a duty of good faith since Pennsylvania would probably not imply such a duty "... in an action which already subsumes it." *Id.* at fn. 8.

The duty of good faith appears to be one of implication that one will pursue whatever course reasonably necessary to carry out the terms of a given contract. "... [A] promise to do an act necessary to carry out the contract must be implied." *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 701 (3rd Cir. 1993).

*In re Clemens*, 197 B.R. 779, 797 (Bankr. M.D.Pa.1996).

█ Closely related to the duty of good faith is the "doctrine of necessary implication". "In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose of the contract and to refrain from doing anything that would destroy or

injure the other party's right to receive the fruits of the contract." *Daniel B. Van Campen Corp. v. Building & Construction Trades Council of Philadelphia & Vicinity,* 202 Pa.Super. 118, 195 A.2d 134, 136–37 (1963). Pennsylvania's Supreme Court recognizes the doctrine of necessary implication. *Frickert v. Deiter Bros. Fuel Co. Inc.,* 464 Pa. 596, 347 A.2d 701 (1975) (Pomeroy, J., concurring). Whether under the Restatement's implied duty of good faith performance of contracts or the doctrine of necessary implication, I am satisfied that PENNVEST's failure to make timely payments on loan advances and to communicate with Wilbar as to the deficiencies in the periodic submissions and final plans were a breach of the duty of good faith present in every contract. See, *Somers v. Somers,* 418 Pa.Super. 131, 137, 613 A.2d 1211, 1214 (1992).

### DAMAGES

Wilbar, in its Brief, suggests its damages "far exceeded the loan proceeds of $1,300,000" supplied by PENNVEST and the loan should therefore be cancelled. (Plaintiff's Post–Trial Brief at 23 (Doc. # 55).) In fact, Wilbar's damages are "detailed" in Mr. Kresge's testimony of June 4, 2002 on pages 128 to 140.[9] Wilbar suggested that the delay in making advances resulted in increased interest charges, as well as the need to secure a $200,000 loan from Summit Bank in order to finance debt resulting from the delay. (Transcript of 6/4/02 at 128–129 (Doc. # 40).) Wilbar lost $100,000 since it installed water meters that, due to obsolescence, will have to be replaced before they can be utilized. *Id.* at 130. Inability to use the metering rate has resulted in a

$217,000 billing loss to Wilbar. *Id.* at 132. PENNVEST never made its final $78,861 payment to Wilbar pursuant to the loan. Wilbar also incurred $205,000 in attorneys' fees. Together with losses in water usage and sanitary usage, damages were estimated by Kresge in excess of $1,300,000. *Id.* at 177.

Wilbar categorizes three areas of damages: (1) accumulated interest charges due to utilization of a personal line of credit in lieu of timely receipt of advances from PENNVEST; (2) loss of income, investment and profit, and market value; and (3) attorneys' fees.

■ "[D]amages cannot be based on a mere guess or speculation, yet where the amount may be fairly estimated from the evidence, a recovery will be sustained even though such amount cannot be determined with entire accuracy". *Osterling v. Frick,* 284 Pa. 397, 131 A. 250 (1925).

### (1) ACCUMULATED INTEREST CHARGES

■ Pennsylvania case law is replete with support that interest, at the legal rate, can be awarded for the untimely payment of a sum certain. *Fernandez v. Levin,* 519 Pa. 375, 379, 548 A.2d 1191, 1193 (1988)("For over a century it has been the law of this Commonwealth that the right to interest upon money owing upon contract is a legal right."). Further support for this position is found in the Restatement (Second) of Contracts, § 354(1). *Id.* Under Pennsylvania law, in an ordinary suit for contract damages, the pre-judgment rate of interest is a 6% legal rate. 41 P.S. § 202.[10] *Nagle Engine & Boiler Works v. City of Erie,* 350 Pa. 158, 38 A.2d 225 (1944) "When a definite time is fixed for the payment of money the law imposes the

---

9. See Appendix 3 (Transcript of 6/4/02 at 128–140 (Doc. # 40).)

10. Had this been a tort claim, damages for delay may have been adjusted upwards. See *Peterson v. Crown Financial Corp.,* 661 F.2d 287 (3rd Cir.1981).

obligation to pay damages by way of interest at the legal rate, for the detention of the money after the breach of the contract for its payment." *Id.* at 228 (quoting *West Republic Mining Co. v. Jones & Laughlins,* 108 Pa. 55, 68, 1885 WL 11147 (1885)).

In determining damages, I find that 9 of the 21 payments were late and without justifiable excuse. I have assessed a per diem rate of 6% on each late payment and calculate the damage at $2,149.53. My calculation is attached as Appendix 1.

■ Notwithstanding this limitation, incidental or consequential damages can also be awarded for other losses caused by the breach. Restatement (Second) of Contracts, § 347(b); *see generally Douglass v. Licciardi Constr. Co., Inc.,* 386 Pa.Super. 292, 562 A.2d 913, 915 (1989). Such an incidental loss would be the actual cost of interest that Wilbar has had to pay to the private institution in lieu of timely receipts from PENNVEST. Calculating that interest at 9%, the minimum testified to at trial [11], together with a finding that the line of credit was in effect from May 22, 1992 [12], I have determined damages based on a supplemental per diem rate of 3% as $657.84. My calculations are set forth in Appendix 2.

### (2) LOSS OF INCOME, INVESTMENT AND PROFIT, AND MARKET VALUE

■ I again refer the parties to § 347 of the Restatement (Second) of Contracts which references that an injured party may receive damages based on expectation interest as measured by "the loss in the value to him of the other party's performance caused by its failure or deficiency." [13]

Wilbar claims to have suffered a loss of income due to its inability to secure a rate hike by using a final amortization schedule before the PUC, that it lost its investment and potential profit because of the obsolescence of water meters installed during construction, and that the market value of its company was destroyed by PENNVEST's failure to make its advances on the construction loan promptly. There is authority in Pennsylvania case law for recovery of items such as lost profits. *Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A.,* 315 Pa.Super. 469, 487, 462 A.2d 686, 696 (1983). Nevertheless, case law has been clear that "[s]ufficient evidence must be introduced to assist the fact finder toward a reasonably certain estimate of the amount of lost profits due to the breach." *Warren v. Greenfield,* 407 Pa.Super. 600, 595 A.2d 1308, 1314 (1991). If the proponent is an existing business, "evidence of past profits in an established business can be a valid and reliable basis for estimating future profits." *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 525 A.2d 1215, 1225 (1987), *appeal denied,* 518 Pa. 627, 541 A.2d 1138 (1988). Without such evidence, the Court is left to speculate as to the existence of such damages. Such speculation cannot be the basis of an award of damages. That is not to say, that "uncertainty concerning the precise calculation" of damages is a barrier to recovery. *Kituskie v. Corbman,* 552 Pa. 275, 714 A.2d 1027 (1998). I recognize that there are "peculiar difficulties inherent in proving such damages", depending on the circumstances of the case. *Bolus, supra.* If left to speculate, I could assume that the PUC would award a rate structure that would calculate the expenses of the water compa-

---

11. See Transcript of 6/4/02 at 45 (Doc. # 40).

12. See Defendant's Exhibit No. 79.

13. Restatement (Second) of Contracts, § 347 has been cited, with approval, by *Douglass v. Licciardi Construction Co., Inc.,* 386 Pa.Super. 292, 562 A.2d 913, 915–916 (1989).

ny and allow for such profit that would represent a fair dividend for the risk taken by its investors. *National Utilities, Inc. v. Pennsylvania Public Utility Com'n,* 709 A.2d 972, 976 (Pa.Commw.Ct.1998).

■■■■■ Having said that, I observe that not a scintilla of evidence has been introduced on this record as to the dollar volume of pre-construction income, gross or net; post-construction income, gross or net; pre– or post-construction expenses; market structure of similar companies or their profitability; or any appraisal testimony.[14] I have absolutely nothing on this record except the unsupported testimony of Carl Kresge that the delay in making advances by PENNVEST resulted in Wilbar (or its principal) having to seek alternative financing at higher rates from a private lender. Proving that PENNVEST inappropriately delayed the delivery of a final amortization, without more, would not allow me to calculate the impact of such delay on the value of the company or estimate the consequence of such a delay on the company's profitability. Moreover, the suggestion, that PENNVEST should somehow be responsible for the lost profit incidental to the presumed growth of the company through population increases and resulting increase in water volume delivered, cannot be considered inasmuch as Pennsylvania has rejected the provisions of *Comment f.* of the Restatement (Second) of Contracts, § 347 that lost *volume* can be a factor in determining lost profits. *Northeastern Vending Co. v. P.D.O., Inc.,* 414 Pa.Super. 200, 205, 606 A.2d 936, 938 (1992). If the injured party is unable to establish "loss of value" under § 347 of the Restatement, damages may be recovered under § 348 based on:

(a) the diminution in the market price of the property caused by the breach, or

(b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him

REST 2d CONTR § 348(2); *see also Douglass,* 562 A.2d at 915.

Wilbar insists that PENNVEST's breaches destroyed the value of the company, thus the outstanding loan should be cancelled. I note that "it has been held that the destruction of a business is not a normal or ordinary result of the failure to make timely payments." *Com., Dept. of Transp. v. Cumberland Const. Co.* 90 Pa. Cmwlth. 273, 282, 494 A.2d 520, 525 (1985) citing *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 357 (1951). As referenced in *Cumberland Const. Co.,* consequential damages requires that damages be either "norma[l] and ordinar[y]" or "reasonably foreseeable and within the contemplation of the parties" and the damages can be proven. *Id.* at 525, *citing Taylor v. Kaufhold,* 368 Pa. 538, 546, 84 A.2d 347, 351 (1951).

■■■ "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Restatement (Second) of Contracts § 352 (1981); *see also Spang & Co. v. United States Steel Corp.,* 519 Pa. 14, 26, 545 A.2d 861, 866 (1988). Illustration 1 of the Restatement under that section provides a perfect example of my concern:

A contracts to publish a novel that B has written. A repudiates the contract and B is unable to get his novel published elsewhere. If the evidence does not permit B's loss of royalties and of repu-

---

**14.** "[D]amages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of sim-

ilar enterprises, and the like." Restatement (Second) of Contracts § 352 (1981), *Comment b.*

tation to be estimated with reasonable certainty, he cannot recover damages for that loss, although he can recover nominal damages.

In the absence of evidence of market value of the water company before and after the breach, I am constrained to rely on the only measurement available to me, i.e., the cost of money on the replacement market as demonstrated by the private line of credit secured by Mr. Kresge in obtaining bridge funding. This cost was previously addressed in this opinion.

### (3) ATTORNEYS' FEES

■ Plaintiff argues that it is entitled to attorneys' fees in excess of $200,000.00. In *In re Clemens,* I wrote:

> The cases in Pennsylvania are legion that counsel fees cannot be awarded.

> " 'Since *Wilt v. Vickers,* 8 Watts 227[, 1839 WL 3561 (Pa.1839)], and *Rogers v. Fales,* 5 Pa. 154[, 1847 WL 4779 (1847)], were overruled, compensation had never been recoverable for trouble and expenses in conducting a suit and establishing a right'.... Over and over again we have decided there can be no recovery for counsel fees from the adverse party to a cause, in the absence of express statutory allowance of the same ...", *Smith v. Equitable Trust Co.,* 215 Pa. 413, 417, 64 Atl.[A.] 591, 592 (1906), or clear agreement by the parties, *Fidelity–Philadelphia Trust Company v. Philadelphia Transportation Company,* 404 Pa. 541, 548, 173 A.2d 109, 113 (1961), or some other established exception, see *Hempstead v. Meadville Theological School,* 286 Pa. 493, 134 Atl.[A.] 103 (1926). *Corace v. Balint,* 418 Pa. 262, 271, 210 A.2d 882, 887 (1965); In accord, *Knecht, Inc. v. United Pacific Insurance Company,* 860 F.2d 74 (3rd Cir.1988); *Chatham Communication[s], Inc. v. General Press,* 463 Pa. 292, 299, 344 A.2d 837, 842 (1975).

*In re Clemens (Clemens v. West Milton State Bank),* No. 5–93–ap–00028, slip op. at 24 (Bankr.M.D.Pa. Jan. 28,1998).

These conclusions compel the conclusion that no award of attorneys' fees can be awarded.

An Order will follow.

## Appendix 1

| Payment Number | Receipt Date | 21st Business | Payment Date | Amount | Interest Rate | Annual Interest | Daily Interest | Days Late | Total Interest |
|---|---|---|---|---|---|---|---|---|---|
| 1-Loan | 09/17/91 | 10/15/91 | 10/29/91 | $147,127.11 | 6% | $8,827.63 | $24.19 | 14 | $338.59 |
| 1-Grant | 09/17/91 | 10/15/91 | 11/01/91 | $32,505.62 | 6% | $1,950.34 | $5.34 | 17 | $90.84 |
| 2-Loan | 10/21/91 | 11/20/91 | 12/05/91 | $18,355.41 | 6% | $1,101.32 | $3.02 | 15 | $45.26 |
| 2-Grant | 10/21/91 | 11/20/91 | 12/05/91 | $17,311.50 | 6% | $1,038.69 | $2.85 | 15 | $42.69 |
| 3-Loan | 11/20/91 | 12/20/91 | 12/26/91 | $56,134.55 | 6% | $3,368.07 | $9.23 | 6 | $55.37 |
| 3-Grant | 11/20/91 | 12/20/91 | 01/02/92 | $12,402.12 | 6% | $744.13 | $2.04 | 13 | $26.50 |
| 4-Loan | 01/13/92 | 02/12/02 | 03/05/92 | $66,784.44 | 6% | $4,007.07 | $10.98 | 22 | $241.52 |
| 4-Grant | 01/13/92 | 02/12/02 | 03/17/92 | $14,755.06 | 6% | $885.30 | $2.43 | 34 | $82.47 |
| 5 | Payment Not Late | | | | | | | | |
| 6 | Payment Not Late | | | | | | | | |
| 7-Loan | 06/10/92 | 07/10/02 | 07/21/92 | $113,296.98 | 6% | $6,797.82 | $18.62 | 11 | $204.87 |
| 7-Grant | 06/10/92 | 07/10/02 | 07/09/92 | $25,031.34 | 6% | $1,501.88 | $4.11 | 0 | $0.00 |
| 8-Loan | 08/07/92 | 09/08/02 | 09/18/92 | $65,321.85 | 6% | $3,919.31 | $10.74 | 10 | $107.38 |
| 8-Grant | 08/07/92 | 09/08/02 | 09/17/92 | $14,431.92 | 6% | $865.92 | $2.37 | 9 | $21.35 |
| 9-Loan | 09/17/92 | 10/19/92 | 11/09/92 | $90,906.68 | 6% | $5,454.40 | $14.94 | 21 | $313.81 |
| 9-Grant | 09/17/92 | 10/19/92 | 11/06/92 | $20,084.53 | 6% | $1,205.07 | $3.30 | 18 | $59.43 |
| 10 | Late Payment Justified | | | | | | | | |
| 11 | Payment Not Late | | | | | | | | |
| 12 | Payment Not Late | | | | | | | | |
| 13 | Payment Not Late | | | | | | | | |
| 14 | 10/18/93 | Payment Not Late When Mailing Time is Added | | | | | | | |
| 15-Loan | 12/30/93 | 02/01/94 | 04/05/94 | $39,067.21 | 6% | $2,344.03 | $6.42 | 63 | $404.59 |
| 15-Grant | 12/30/93 | 02/01/94 | 04/05/94 | $8,631.34 | 6% | $517.88 | $1.42 | 63 | $89.39 |
| 16 | Payment Not Late | | | | | | | | |
| 17 | Payment Not Late | | | | | | | | |
| 18-Loan | 08/05/94 | 09/06/94 | 09/08/94 | $75,170.60 | 6% | $4,510.24 | $12.36 | 2 | $24.71 |
| 18-Grant | 08/05/94 | 09/06/94 | 09/08/94 | $2,324.86 | 6% | $139.49 | $0.38 | 2 | $0.76 |
| 19 | Late Payment Justified | | | | | | | | |
| 20 | Late Payment Justified | | | | | | | | |
| 21 | Payment Not Made---Loan Exhausted | | | | | | | | |
| | | | | | | | | TOTAL | $2,149.53 |

### Appendix 2

| Payment Number | Receipt Date | 21st Business | Payment Date | Amount | Interest Rate | Annual Interest | Daily Interest | Days Late | Total Interest |
|---|---|---|---|---|---|---|---|---|---|
| 7-Loan | 06/10/92 | 07/10/02 | 07/21/92 | $113,296.98 | 3% | $3,398.91 | $9.31 | 11 | $102.43 |
| 7-Grant | 06/10/92 | 07/10/02 | 07/09/92 | $25,031.34 | 3% | $750.94 | $2.06 | 0 | $0.00 |
| 8-Loan | 08/07/92 | 09/08/02 | 09/18/92 | $65,321.85 | 3% | $1,959.66 | $5.37 | 10 | $53.69 |
| 8-Grant | 08/07/92 | 09/08/02 | 09/17/92 | $14,431.92 | 3% | $432.96 | $1.19 | 9 | $10.68 |
| 9-Loan | 09/17/92 | 10/19/92 | 11/09/92 | $90,906.68 | 3% | $2,727.20 | $7.47 | 21 | $156.91 |
| 9-Grant | 09/17/92 | 10/19/92 | 11/06/92 | $20,084.53 | 3% | $602.54 | $1.65 | 18 | $29.71 |
| 10 | Late Payment Justified | | | | | | | | |
| 11 | Payment Not Late | | | | | | | | |
| 12 | Payment Not Late | | | | | | | | |
| 13 | Payment Not Late | | | | | | | | |
| 14 | 10/18/93 | Payment Not Late When Mailing Time is Added | | | | | | | |
| 15-Loan | 12/30/93 | 02/01/94 | 04/05/94 | $39,067.21 | 3% | $1,172.02 | $3.21 | 63 | $202.29 |
| 15-Grant | 12/30/93 | 02/01/94 | 04/05/94 | $8,631.34 | 3% | $258.94 | $0.71 | 63 | $44.69 |
| 16 | Payment Not Late | | | | | | | | |
| 17 | Payment Not Late | | | | | | | | |
| 18-Loan | 08/05/94 | 09/06/94 | 09/08/94 | $75,170.60 | 3% | $2,255.12 | $6.18 | 2 | $12.36 |
| 18-Grant | 08/05/94 | 09/06/94 | 09/08/94 | $2,324.86 | 3% | $69.75 | $0.19 | 2 | $0.38 |
| 19 | Late Payment Justified | | | | | | | | |
| 20 | Late Payment Justified | | | | | | | | |
| 21 | Payment Not Made—Loan Exhausted | | | | | | | | |
| | | | | | | | | TOTAL | $613.15 |

### Appendix 3 (Transcript)

**Kresge–Direct/Borland page 128**

Q   Now in general, Mr. Kresge, what has the impact been of the failure of PennVest to ever put this loan in an amortized status?

A   Well it has caused me to go bankrupt in my personal company, my personal and the water company.

Q   How is that?

A   Well, the timely payments that didn't come forth, the interest constantly at the bank I couldn't get rid of, their willingness to not put this loan to-done, and after numerous times calling down there to do that, it didn't happen.

Q   Well, let's first take the timely payments that you described. How much interest on a line of credit with Summit did the failure of PennVest ultimately cost Wilbar?

A   Over $150,000.

Q   How did you come to that conclusion?

A   By bank records and the payments that we had made and-the bank records in plain English.

Q   What did you do—what did you look at to see what that number was?

A   Well, the statement and the payments that we had paid, naturally, were all-and the bank gave us a print out of what was on it.

**Kresge–Direct/Borland page 129**

Q   And how much are you out on your line of credit with Summit today?

A   Two hundred thousand dollars.

Q   Now you told us earlier that getting the final amortization of this loan was a pre-condition to your ability to go ahead and get a metering rate from the PUC for your customers.

A   That's correct.

Q Do you recall that? And, in fact, have you ever sought a metering rate for your customers?

A No, I have not.

Q Are the meters installed?

A Yes, they are.

Q Well first are the meters—when did you install those meters?

A Almost ten years ago.

Q Are the meters now of any use based on obsolescence–

A Oh, I'm getting letters—

Q —or condition of them?

A —letters from the Public Utility Commission as we speak that they have to be tested or authenticated or changed.

Q And—

MR. HARTWELL: Your Honor, I would object to that last answer. Those are letters from the PUC. It's clearly hearsay.

**Kresge–Direct/Borland page 130**

THE COURT: Sustained.

Q What's the condition of your meters?

A They would be illegal to be used to calculate a bill from my customer, because they're too old.

Q And what is the loss to you of the meter installations which never were of use?

A A hundred thousand dollars.

Q How do you come to that conclusion?

A The cost of the meters at the time right now to re-change them.

THE COURT: The cost to what?

THE WITNESS: The cost of the meters and the changing-to change them.

THE COURT: Cost and changing. Okay.

THE WITNESS: Of the meters, yes.

Q Now, Mr. Kresge, had you been able to secure the more favorable metering rate by the time you had completed the project, in fact, whether it's—withdraw that. If you'd been able to seek and obtain a metering rate for your customers at the time you completed the project, what impact would that have had on your cash flow at Wilbar?

A I feel the interest charges and the failure to be able to have that cost well in excess of $150,000.

Q Why?

A Well I couldn't go for the rate. It didn't come in, and

**Kresge–Direct/Borland page 131**

then there was a—at least an 11 percent growth of population in the area which meant that there were more houses that could be charged.

Q Well I'm going to come back to the growth question in a moment, but the issues of what difference the rate makes, now why would you have done better if you'd been able to do a metering rate for even the customers that were already in place?

A Well it would've been—the company would actually make more money on the metering rate.

Q Well what would the difference be?

A Well there would've been a more—a more expensive rate than the flat rate that I exist on.

Q How do you know that?

A Well all other water companies in the area and the knowledge of their metering rate and other companies that actually have meters and meter rated.

Q Did you have—did you reach some conclusion as to what that difference would be on a per customer basis?

A Yes, we did.

Q And what did that work out to be, Mr. Kresge?

A That should be somewhere around $140,000 that I recall.

Q Over the period of time from completion of your project–

A Yes.

Q —to the present?

### Kresge–Direct/Borland page 132

A Yes.

Q And in addition to that, you said something about 11 percent growth rate. Was the $140,000 figure based on what your customer base was at the time you completed construction?

A That's right.

Q All right, so what does this 11 percent have to do with anything?

A The 11 percent growth rate of people in the area, so the population is up, the company is producing more water, and putting out more water but at the flat rate.

Q So that would increase your revenues?

A That would've increased the revenues, also.

Q All right, and do you have some reason to think that you have more customers now at your water company sites than you did in 1994?

A Oh, I do have, yes, they are.

Q And based on that experience and observation, do you have some understanding of how much you lost because of PennVest's actions that

prevented you from getting the metering rate?

A I've calculated about $77,000 in that.

MR. BORLAND: Excuse me just for a moment, Your Honor.

(Pause)

BY MR. BORLAND:

Q Now I previously had shown you what had been defendant's

### Kresge–Direct/Borland page 133

exhibit 46, and you disclosed to us— and you identified this as payment application 19 dated November 2nd, 1994.

A Yes.

Q And on that application can you tell me whether you received that payment? Can you recall?

A I did not.

Q Okay, and do you know why you didn't receive that payment?

A Well in the end it was kept for interest charges that was run up by the tardiness of PennVest.

Q And what was the amount of the payment that you were supposed to receive but did not receive on that?

A Around $81,000.

Q Well where on this does it say $81,000?

A It doesn't. I says 78,861, as I recall. Yea.

Q So 78 eight, and so that's an—did you believe you were entitled to that based on your performance under the contract?

A Yes, I did, minus the $3,000 that they said I was over funded.

Q In the course of dealing with PennVest with regard to all of these issues, Mr. Kresge, including seeking the pass through surcharge rate re-

lief with the PUC, what expenses have you gone to with attorneys?

A Somewhere around $205,000.

Q And how much of that is attributable to PennVest's actions?

**Kresge–Direct/Borland page 134**

A All of it.

Q Why do you say that?

A I've been to a lot of attorneys and a lot of actions and the bankruptcy.

Q Now, Mr. Kresge, are you familiar with the market value of the water companies that make up Wilbar?

A Yes, I am.

Q All right, and are—how are you aware or familiar with what the value of the companies have been over the past ten years? How do you know that?

A They have become downgraded mainly, because the company—

Q No, what I'm asking you is how do you know. How do you know what these things are worth at any time?

A They're worthless, because no one will want to buy them.

Q Oh, okay. Understand my question.

A Sorry.

Q How do you as a witness and as an owner of these properties have any idea what water companies that you own are worth? How do you know that?

A From the knowledge of other companies and other sales. I know that, and I—

Q And from time to time have you over the years made assessment of the value of your properties?

A Yes, I have.

Q Okay. Now in your opinion has the action—have the

**Kresge–Direct/Borland page 135**

actions of PennVest over these past 11 years, since the loan was approved, had any impact on the value of your water company assets?

A Yes, it has.

Q And how would you describe that impact?

A I feel the—unable to get the metered rate and to be able to function and paying back a PennVest loan has cost at least $500,000 damage to Wilbar Water. I feel that the unability for the same company, which is not a separate company and the sewer company, that I have the same problem with the sanitary company, so I feel that there is at least a degrading of my company in wealth to at least a million dollars.

Q You said there's two components— sanitary and water?

A Yes.

Q And were the PennVest improvements that were the subject of this loan intended for the sewer or sanitary company?

A No, it was not.

Q Well let's start with that for a moment. Why do you think that PennVest's actions or their breaches of their covenants in this case in any way had impact on the valuation of your sanitary assets within Wilbar?

A Well, again, there's no way I could go before the Commission to raise the rates in the sewer, which needs to be raised.

Q Why?

**Kresge–Direct/Borland page 136**

A They needed to be raised in 1990, because the incoming monthly amount is nowhere near standard to other sewer companies, and the ser-

Q&A transcript:

vice is impeccable, and it just doesn't make enough to pay its way.

Q Why couldn't you get rate relief from the PUC because of PennVest for the sanitary side of—

A Wilbar going to PennVest-or PUC might just as well hang it.

Q Why?

A They're not going to look—they're not even going to look at it with a non-performing, unamortized PennVest loan for the water division.

Q Now how did you reach a conclusion that the impact of this would be, on the sanitary sewer side, $500,000?

A Because of the general rate increase that would've come on. It probably would've been tied to the metered rate on the water side, because each one of those customers would have a water meter which would ultimately make a higher bill if they used more water, so not only would they pay more sewer—or water, they would pay more sewage, and that has never come to the company, and, of course, interest charges and—

Q Well how would that influence the value of your company to sell it to someone else?

A The buyer would not want to pay anything for it.

Q No, but what I'm saying, Mr. Kresge, is if you had gotten

### Kresge–Direct/Borland page 137

these good things that you anticipated would happen to you when you began your relationship with PennVest, looking down the road, the things that have happened that you had anticipated happen, you got the rates that you planned on getting, how would that improve the value of your assets?

A Well, again, to a buyer it would be-a person would be more apt to pay more per customer or more for the full water and sanitary company.

Q Is the same thing true on the water side?

A Yes.

Q Now have you had the opportunity to actually put a value on your properties prior to these events with PennVest? Do you have an idea what the properties are worth?

A Yes, I have.

Q And what were those values?

A They're in excess of three million dollars.

Q Okay. Now since the filing of the bankruptcy have you had inquiries and offers for purchase of the properties?

A Yes, I have.

Q And what have you been offered for the purchase of the Wilbar properties?

A Basically not enough to even pay back the creditors.

Q Well what would that be? Now when you've had offers, have they also been associated with Washington Park, which is part of the bankrupt estate?

### Kresge–Direct/Borland page 138

A Well, the first offer was with Washington Park included.

Q Right, so that's not part of the bankrupt estate.

A No.

Q Do you have an idea how much Washington Park is worth?

A Washington Park is worth at least one point six/one point seven.

Q Okay. Million?

A Yes.

Q Okay, and so what was the total offer for all of these assets?

A They wanted to give me a million dollars in different directions—by stock and monies to come in as customers came on line, and it was going to come out to about one point three million dollars including Wilbar for the washout for the Penn-Vest loan.

Q Meaning that the PennVest loan would be assumed?

A Yes.

Q And that would take the lion's share of the one point three million dollars.

A Right.

Q If not all of it.

A Right.

Q So—and that included Washington Park?

A Yes.

Q Have you had any offer to purchase the Wilbar assets

**Kresge–Direct/Borland page 139**

without Washington Park being associated with it?

A No, I have not.

Q Does the Washington Park association make the Wilbar properties more attractive to a potential buyer?

A They do.

Q So at this particular stage is it your opinion that the—what is your opinion with respect to the value of the Wilbar assets only as compared to the debt associated with it on the books?

A Well if Wilbar wasn't bankrupt and if Wilbar was paying an amortized loan back, there—the companies would be worth a lot more, because

we wouldn't have a press situation on Wilbar.

Q Can you quantify that?

A Yes, I can.

Q And what would that be?

A Well, when you're in bankruptcy, it's a tough thing. I have never experienced it in my life before. You can't walk into a store and sign your name to a slip anymore and walk out with it.

Q What I mean is, Mr. Kresge, the impact of the PennVest loan circumstances has devalued your assets in your opinion.

A This is true.

Q Can you tell the Court by how much?

A Well at least the million—what I've got involved with has to be at least $1,700,000 worth.

**Kresge–Direct/Borland page 140**

Q Based on the million dollar devaluation of the value and the $700,000 losses—

A Yes.

Q —that you've detailed for us?

A Yes.

### ORDER

For those reasons indicated in the Opinion filed this date, **IT IS HEREBY**

**ORDERED** that judgment is entered in favor of PENNVEST as follows: PENN-VEST has a first priority secured claim as of the filing date in the amount of **$1,390,000.12** {$1,392,762.80 less $2,762.68}.